and L. Mr. Baskin for the appellant, Ms. Marcus for the appellees. Good morning. Maurice Baskin for the appellant, Associated Builders and Contractors. I've reserved three minutes time for our rebuttal. This is a challenge to specific portions of a new Labor Department Affirmative Action Rule that conflicts with the plain language  of Section 503 of the Rehabilitation Act. Now, since our position has been somewhat mischaracterized by the Department and the District Court, let me say at the outset we are not here challenging affirmative action generally. We're not challenging many aspects of the rule. We are really challenging only two things, the authority of the agency to go beyond what Section 503 allows it to do, in particular with regard to data collection and analysis, very burdensome provisions, and the failure of the agency to recognize longstanding differences between types of industries, mainly construction and other industries. The District Court held with a sense of irony that the Department has unqualified power to regulate disabilities in the affirmative action context. But that's not what Section 503 says. 503 qualifies their power with the word qualified. So as they say, the Department says that their view is that the statute does limit their authority regarding hiring to qualify people with disabilities, but it doesn't say one way or another about the kind of data they can collect. And for you to win, you limit the Department's ability to collect this data. You have to be plain on its face. I'm not misstating your argument, am I? That's your point, that these regulations violate the plain language of the statute, correct? Yes. So what is it in this language that plainly prohibits the Department from collecting data about qualifications? It all goes back to the type of data and the purpose of the data. And it all starts with Section 741.40, which I want to highlight because it really didn't get enough attention. I was asking about the statute. Oh, well, the statute, the plain language is affirmative action to employ qualified individuals with disabilities. Right, to employ qualified individuals, but the Department says that doesn't say one way or another whether they can collect data about qualifications in order to fulfill their statutory obligation regarding the hiring of qualified individuals. That's their point. But I submit in response to that point that that point is identical to arguments that have been made by many other agencies and in which, in fairness, the way you stated it and the way the Department is actually stating it, it's not our burden to show an explicit restriction. It's their burden to show an actual delegation of authority. No, I don't think so. You're arguing that the plain language of the statute bars them from doing this. It's a Chevron 1 question. Absolutely. And therefore, there can't be any other reasonable interpretation that supports the agency. And so you agree, you have to show that this statute plainly prohibits the collection of this data, that it can only be interpreted in that way, right? I do not agree quite with the wording. It may be semantics. But let me just point to, to me, this is very remarkably similar to the Colorado River Indian Tribes case on which you sat, coincidentally, and in which Congress said they created the commission to regulate Class 2 gaming. And the commission was created of the Indian Tribes. The commission said, well, Congress didn't explicitly tell us we couldn't also regulate Class 3 gaming, so let's just go ahead and do it. It's similar. Sam, this is about, this is about the word shall take affirmative action. This is really not about the words qualified individuals. The question is what kind of affirmative action might advance the employment of qualified individuals? And on that question, the agency's view is that we need to know this kind of data, just to take the data as an example, in order, in the end, to figure out how to advance qualified individuals. Not that we're trying to advance non-qualified individuals, but before we can tell whether individuals are qualified or not, whether you're taking appropriate affirmative recruitment steps or not, we need a bunch of data about how many qualified people there are out there, about how many disabled people there are out there. Why is this an unreasonable interpretation of the word shall take affirmative action to employ? Why is it? For two reasons. First, there's no linkage between the data they are collecting and any determination. So, imagine that the data showed that there was a huge percentage of disabled people in the, who are applying, and you're hiring none. Now, you don't think that they might think from that that some of those huge number, maybe even one, was a qualified person? And just from the mere fact that there were a huge number of disabled people in your applicant pool, and you are hiring none, would be an inference that you're not taking affirmative action to employ qualified people. You think that would be an unreasonable inference? It would be. And, in fact, that's the fear. That's what you rely on, I think. No, no, no. It would be a total misuse of statistics, and we're not talking about using It's the idea that you can collect information. Let's just take another, you want to measure, let's say they wanted to measure the number of blondes who are applying, and they said, well, we can't really tell how many there are, so we want the contractors to measure, to take information on all the people with hair. They're not related. There is not a direct linkage between the number of disability applicants out there in the workplace and those who are qualified. It can only be determined on a case-by-case basis. And the department is saying, we want you to use statistics, and they say this right at the outset in Section 40. They say what their general purpose is, because you stated that this is about what affirmative action is, and they say affirmative action is a tool designed to ensure equal employment opportunity and foster employment opportunities for individuals with disabilities, and regardless, because they don't say, they don't put in the word qualified, regardless of individuals with qualifications. And right after that, they say that's why we're seeking the measurable objectives, quantitative analysis, and internal auditing. It's because they have adopted this broad view, much broader than what Congress said, of who they're trying to help. It's a lofty goal. It's a burdensome goal. Congress struck a balance that said if you're going to do these things, it needs to be to employ qualified individuals with disabilities, to measure all of these people who are disabled, self-identified, with no relationship to their qualifications, particularly in the construction industry, where people are coming and going. And this is not so much about the hazards in the industry, that's one aspect. It's about the transitory and fluid nature of the employment process in the industry, for contractors to try to be constantly picking up when jobs are coming and going on a daily basis, who's in and who's out, and who, taking all of these metrics together, with no bearing on their qualifications. Everyone who's in fills out an application of some sort, right? Not always in the construction industry, but yes. Let's take that as a given. So they're asked an additional question? But not just asking. They're required to measure it. If you look at 44K, they're supposed to engage in five different metrics of analysis. And then the Department says, well, we don't know what it means. So the applicants are asked an additional question? Yes. And they are supposed to get this additional information. I'd like to reserve the remainder of my time for rebuttal, if I can, unless there are other questions. I actually do have one, and perhaps the presiding judge will restore you in a moment. I'm not sure that this is the same as what Judge Garland asked you, but if the data show that there workforce of the inquirer. I think the question raised was whether it wouldn't be a reasonable inference that there was discrimination. Maybe I mistook that. But I think, as I understood the Department's position, all that would raise is a reasonable inference that you might not be engaging in all of the outreach activities that would be useful. And so let's look at that. And if you are, then that's the end of it. And they actually say they're not using it as in drawing an inference. They're not going to use it to draw an inference. So then, therefore, why isn't it sufficient as a first step to determine whether you're taking appropriate steps? Because it is a burdensome step, which does not link up. That's the point. It has to link up to qualifications. So burdensome sounds like you're making an arbitrary and capricious argument, not like you're making a Chevron argument. Well, you're asking why we're injured. No, I'm not asking why you're injured. I'm asking why the words of the statute don't justify what the agency is doing. Because there's no linkage between this misuse of statistics to finding out who's qualified and who's not in the workplace. And the Department itself has disclaimed the intent to use this data for the purpose of determining whether there is discrimination based on qualifications. And, therefore, there is no purpose to the data. So why are we doing it? No, we just went through that. The purpose was to see whether you're doing everything you might reasonably be asked to do. To do for individuals with disabilities not qualified. Well, suppose... No, no, no, no. If it shows up that there are lots of applicants and no employees that are disabled, the Department can then, using this data, see that, come to you, send you a checklist and say, have you listed these openings and job fairs? Have you found organizations that try to place disabled people? That's the consequence, and that's the end of the story. Well, these are things that we're already doing. Well, maybe that's the answer. We're already doing those. So then you've given an answer and they go away. Yes, but in the meantime, they're asking us to do things. Okay, and that's where you use the word burdensome. Yes. So, the burden is we have determined an additional question on application, some data retention and reporting. And I think that's quantified in dollar terms at page 41. Yes. And it's also available on the web in terms of the OMB's calculations for the Payboard Reduction Act purposes. Yes. Millions of dollars. And, you know, when you aggregate, how many employers are affected? It varies, but 20,000 is one number, and others say hundreds of thousands. I thought it was somewhere north of 100,000. Is that not likely? Yes. So, the larger that number, the smaller per contractor the dollar amounts. But the time amounts from OMB are very modest. Very modest? We're talking about a minute here, three minutes there, 60 minutes at the end of the year? Well, they're grossly understated according to the information in the real world of what people are trying to do, burdened already with many other obligations. And so we're now mixing the statutory language. The statute means what it says, and it says that they are supposed to do something different than what they're doing. It says they're supposed to be asking for affirmative action of qualified people, and they are requiring contractors to take affirmative action, which in the Department's own words are for the broader class. The affirmative action you're talking about that they're requiring is the data gathering, not hiring. That's what they maintain. Yes. Yes. The data and the goals, which we haven't had a chance to talk about. Thank you. Let me just try a different, let me follow up on Judge Ginsburg's question. You've been focusing on the recruiting aspect of it, but am I right that under this statute an employer is required to make reasonable accommodation to a disability? Is that correct? Yes. Okay. So suppose, for example, an employer has a whole series of jobs that require in the construction industry that people be able to stand. The Department's view, I think, is that by collecting this data and finding out what kind of disabilities people have who are applying might end up leading the employer on his own to take a look at the job and realize that because of technology a reasonable accommodation can be made to these people, whereas without that data he wouldn't know that. And the data that they're asking to be collected will do nothing to advance that particular objective. Well, but if a large number of people are applying for these jobs with disabilities who might be able to get the job with a reasonable accommodation, that would tell them that. Maybe in the end you can't accommodate to it, but at least the employer or the Department would look at that question with this data. But the information collected doesn't say anything about, in that example, ability to stand, not stand, what jobs they're applying for. It does not have meaning for this broader purpose that they are describing. And let me just conclude on this by saying that we're not at all objecting to the duty of accommodation, and our contractor members are doing that all the time for the disabled. Thank you. Thank you. We'll hear from the government. Thank you. Good morning. I'm Stephanie Marcus from the Department of Justice, and I represent the federal defendant at police. And I will just begin by saying that, Judge Tatel, I think the way you phrased it at the outset about how we interpret this statute is correct. Under the plain language of the statute, Congress's intent was clear to that it wanted to advance the employment of qualified individuals with disabilities. The Labor Department's final rule does not do anything further than that. The agency's stated goal is to do that, and it certainly does not require any contractors to hire unqualified individuals. And the data collection and utilization goal helped advance the ultimate purpose of hiring qualified individuals with disabilities, and the department strengthened and revised its regulations in response to data that showed that there is still, under existing regulations, there was still a significant disparity between individuals with disabilities and non-disabled workers in employment, in poverty levels, in wages, and so it was necessary to do something more. And I also, I think another example of how the data collection, when someone applies for a job, there's no way of determining in a vacuum whether that person is qualified. There are particular jobs that have different qualifications, and by gathering the data, the Labor Department wanted to provide a tool for both the contractors themselves and the agency to better evaluate how the affirmative action steps were actually working. And one example the court has already given, or you could have an example where there are many individuals with disabilities in a community, and if a contractor finds that they have no self-evaluation. The agency on the face of the regulation stated at the beginning that these measures taken together are designed to bring more qualified individuals with disabilities into the federal contract workforce. That's on page 10 of the joint appendix. And we think the district court was completely correct in saying that the agency was well within its statutory authority and reasonably promulgated these measures. Can I ask you a question about the utilization goal? Yes. On page 52 of your brief you say, no record keeping, assuming that the utilization goal is triggered, such assessments are independently required of contractors, whether or not the percentage of individuals with disabilities in one or more groups or within a contractor's entire workforce is less than the goal. You don't mean, or do you mean, that when it's discovered that they're not within the goal, that nothing more is required than would ordinarily be required anyway? In which case, it would seem foolish to have a goal at all. Well, if you look at the provision of the utilization goal, what it says is that if the contractor determines it's less than the utilization goal, the contractor must take steps to determine whether and where impediments to equal employment opportunity exist. However, when you look at the specific things, so it triggers a need to look at these things, but these steps are independently required. So you're saying the utilization goal is really totally irrelevant, doesn't make any difference at all because they had to do this anyway? That can't be. Because if that can't be, then what's the point? Because it gives them a benchmark and a quantitative measure. But you're saying they're already doing the goal. But they may not realize that it's not, I think it helps, it is a useful data-driven benchmark that they can compare their efforts against, which they did not have before. And it may be that they were. So they actually don't have to, the moment they see that they're below 7%, take as an example, they don't have to do anything any more than they were doing before? Well, at that point, they need to do the things that, as I said, these are independently required by, for example, the first thing, the contractor must assess its personnel processes, and this is already required under 741. So they don't have to do anything. I'm the contractor. I see I'm under 7%. I say, oh, no, 7%, but I've already been doing these things because you told me I'm already doing these things. But what the hope is, is that's going to be a tool to make the contractor realize that maybe what we're doing under this isn't good enough. Well, I looked at this, at the citation, which is the .44B, as the example of what, that has to do with periodic reviews. Right. Isn't this, maybe I'm wrong, is this not an additional review that has to be done regardless of your annual periodic reviews? Well, it is an, the utilization analysis itself is an annual, it's an annual evaluation. So it does. So it's in addition to that annual one, or you can wait until the next January? Well, I mean, depending on, you know, I don't know if different contractors would have different schedules, but I think what this does is when you do annually have to do this, and you can audit of your personnel processes in conjunction. And I should add that if you do meet the goal, it doesn't relieve a contractor of their responsibility. I understand, but I'm asking what happens if you don't meet the goal. And the Section E says, if it's less than the utilization goal, the contractor must take steps to determine whether impediments. And then it describes what the steps are. But are you saying that, is the government's position that those steps are steps it already had to take anyway? So there actually is no burden because there is nothing more that needs to be done that was already being done? And imagine that a contractor was on a regular year basis doing this on January, and it discovered in, I don't know, March, that it was below the goal. They could wait until the next January before its regular periodic review? Well, I think the difference is that these measures are taken together. And taken together, they now, hopefully through the pre-offer self-identification requirement and through the data collection and analysis provisions, will actually have data that they can use. So what it does require that is new, and the department has been clear, it did not previously have the utilization goal under the 503 regs, though construction contractors were subject to such goals under the executive order regulations. But in any event, this does give them different data that they can look at and they're required to do annually. It's just that the review, the affirmative action requirements under 503 had already required them to do this sort of review. They now, hopefully, just have much better tools to do it. But the must-take steps language then you're saying adds nothing at all to the steps they already must take. Is that right? Well, it's doing the utilization analysis itself. No, but that was before. So the way the Part E reads is when the percentage of individuals is less than the utilization goal established. So they've already determined that. At that point, the contractor must take steps. Now, are you saying that those are steps that they've, not new steps, just the regular steps that they already take? These are, they are independently required by other provisions of the rules, so they would need to take them anyway. However, it is hoped that they would do so with more critical eye when they're, you know, seeing that they're not meeting the 7%. But there is no sanction, no penalty, nothing in here that isn't. I'm not asking about the penalty or anything. I'm just asking, assume that they're contractors willing to follow whatever rule is without having to be sanctioned in order to get them. And I'm trying to assess whether there is any burden at all. And what you're telling me is there's no burden at all because failure to meet this utilization goal doesn't require you to do anything. To take any steps that you weren't already taking. Well, it does in terms of the, I guess just in terms of the timing of it. You need, once you make that determination, which you're required to do annually, you then do the things you're required to do anyway, but it triggers that point. And then you don't, and then if you find an impediment or a barrier, then you do have to take action. So it's not meaningless in that sense, certainly, in that it triggers, you know, you're going through all these processes at that time when you don't meet the goal. But the important thing, it doesn't impose an additional burden at that point in that whether or not you meet the goal, these are things contractors need to be doing. Further questions from the back? Thank you. Thank you. Does Petitioner have any time? We'll give you another two minutes.  Well, it's clear the district court found that there are additional requirements in the department's own impact statement. They say that analysis required by Section 45 utilization incurs additional millions of dollars of burden on top of the 44. Is that the burden of finding out whether you've met the utilization goal, or is that a burden that happens after? That's what I was asking about, the burden afterwards. Right. Well, they describe it as utilization analysis. I guess they're not totally specific about that. It seems clear to us from a plain reading of it that they are requiring analysis to take place specific to the goal that was never before required. And then on top of that, there's F, the action-oriented programs that are also supposed to take place. And I guess our point in the limited time on rebuttal here is simply there's no discussion or explanation for why the same goal would be applied to radically different industries and radically different job groups within industries. That's our arbitrary and capricious argument. There's really no, aside from the unusual or eccentric calculations and methodology to come to any particular number, why is that number being applied? It's never been done before in any of these other contexts. All right. Now we're beyond rebuttal. This is sort of opening up a new set of questions. So let me just ask if anybody on the panel has questions. No. Thank you very much. We'll take the matter under submission.